2-10-021-CV
















 

 

 

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

 

NO. 02-10-00021-CV

 

 


 
 
 IN THE INTEREST OF K.R.B., A CHILD
 
 
  
 
 
  
 
 


 

 

------------

 

FROM THE 78TH
 DISTRICT COURT OF WICHITA
COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

 

I.  Introduction

          In two issues, Appellant
Amanda G. appeals the trial court’s order appointing her and Appellees Laura P.
and Hubert P. joint managing conservators of K.R.B., with Appellees having the
exclusive right to designate K.R.B.’s primary residence.  We will reverse and remand.

 








II.  Background

          Three-year-old K.R.B. was
born on September 14, 2006.  Amanda is
K.R.B.’s mother.  Joshua B. is K.R.B.’s
presumed father.  According to Appellees’
original petition, Laura is K.R.B.’s great aunt and Hubert is K.R.B.’s great
uncle.

          Amanda started using drugs sometime in
late 2005 or 2006 (before she became pregnant with K.R.B) and continued using
drugs for a period of time after K.R.B. was born.  CPS intervened in K.R.B.’s care at some point
in May 2007; Amanda had tested positive for methamphetamine and later agreed to
a child safety and evaluation plan with Appellees pursuant to which Appellees
took possession of K.R.B. in June 2007. 
According to Laura, the expectation was that Appellees would care for K.R.B.
while Amanda “[got] her act together.” 
But in December 2007, after Amanda had been arrested again, Appellees
filed an original petition seeking to be appointed sole managing conservators
of K.R.B. and requesting temporary orders.[2]  Appellees supplemented the original petition
with allegations that K.R.B.’s physical health or emotional development would
be significantly impaired if a parent were named a managing conservator and
that they should be appointed possessory conservators with reasonable
possession and access to K.R.B. if they were not named sole managing
conservators of K.R.B. or joint managing conservators of K.R.B. with the right
to establish his primary residence.

          Joshua signed a “Father’s Affidavit
for Voluntary Relinquishment of Parental Rights” in which he stated that he is K.R.B.’s
father and that he “freely and voluntarily give[s] and relinquish[es] to
[Appellees] all [his] parental rights and duties.”  Joshua also signed a waiver of service, in
which he acknowledged receipt of the original petition and, among other things,
waived his appearance at a temporary orders hearing set for August 28, 2008,
and “approve[d]” the appointment of Appellees as the managing conservators of
K.R.B., believing it to be in K.R.B.’s best interest.[3]

          The trial court entered temporary
orders in September 2008.  It appointed
Appellees and Amanda temporary joint managing conservators of K.R.B., with
Appellees having the exclusive right to designate K.R.B.’s primary
residence.  The temporary orders also set
out Amanda’s visitation schedule with K.R.B., which required supervised visits
that eventually phased into a visitation schedule that is consistent with the
standard possession order; permitted Appellees to request that Amanda submit to
one hair follicle test every thirty days; ordered Amanda to pay Appellees
monthly child support; prohibited smoking in the presence of K.R.B. or in the
house while K.R.B. is present; prohibited the consumption of alcohol by any
person within twenty-four hours of exercising or supervising visitation of
K.R.B.; prohibited “illegal drug use at any time”; and, among other things,
prohibited Dustin P., Amanda’s former boyfriend, from being present during any
of Amanda’s visitations.

          After a bench trial, the trial court
found “by a preponderance of the evidence that the best interests of the child
would be to continue the temporary orders into a final order.”  Therefore, in its final order, the trial
court appointed Appellees and Amanda joint managing conservators of K.R.B.,
with Appellees having the exclusive right to designate K.R.B.’s primary
residence.  The trial court ordered that
Amanda exercise possession of K.R.B. pursuant to the standard possession order
but required that overnight periods of possession be supervised by Amanda’s
mother or father.

          Amanda filed a motion for new trial
and a request for findings of fact and conclusions of law.  The trial court denied the motion for new
trial and signed findings of fact and conclusions of law, which included in
relevant part the following findings:

3.       It is in the best interest of the child
that [Appellees] and [Amanda] be appointed joint managing conservators of the
child.

4.       It is in the best interest of the child
that [Appellees] have the right to designate the child’s primary residence.

5.       Appointing the parents, [Amanda] and
[Joshua B.], as the only joint managing conservators of the child would
significantly impair the child’s physical health or emotional development and
appointing [Amanda] as a conservator with the right to establish the child’s
primary residence would significantly impair the child’s physical health or
emotional development and would not be in the child’s best interest.  Some of the facts supporting these findings
are as follows:

(a)     That [Amanda] has been neglectful of the
child’s medical needs.

(b)     That [Amanda] has engaged in a lifestyle
involving criminal conduct which creates an unstable and harmful environment
for herself and the child.

(c)     That while on deferred adjudication
probation for multiple criminal offenses, [Amanda] has knowingly engaged in
conduct that violated the terms and conditions of those probations.  Such violations could result in her being
sentenced to the Texas Department of Corrections.

(d)     That [Amanda] has put her own gratification
and needs above the child’s needs and welfare.

(e)     That [Amanda] has associated with
individuals who have engaged in criminal behavior, and that such associations
are not in the best interests of, and pose a risk to, the child.

(f)      That [Amanda] repeatedly engaged in
conduct detrimental to herself and the child.

(g)     That the child has been raised almost
exclusively by [Appellees] since on or before June 10, 2007.

(h)     That the Petitioners have been
significantly involved in raising the child since his birth.

The trial court
made one conclusion of law regarding conservatorship:  “The evidence supports a finding that the
child’s physical health or emotional stability would be significantly impaired
if the parents were appointed as joint managing conservators.”

          The trial court later entered an additional
finding of fact:

7.       Appointing [Amanda] as the sole managing
conservator of the child, [K.R.B.], would not be in the child’s best interest
because it would significantly impair the child’s physical health and emotional
development.  This finding is supported
by the evidence, including the following:

(a)     That [Amanda] has engaged in a [lifestyle]
involving serious criminal conduct and associating with persons who engage in
such criminal conduct which will create an unstable and harmful environment for
the child.

(b)     That while on deferred adjudication
probation for multiple felony offenses, [Amanda] has knowingly engaged in
conduct that violated the terms and conditions of those probations and her
continuing to make such choices will probably result in her being incarcerated.

(c)     That [Amanda] has put her own gratification
above the child’s needs and welfare which would probably lead to significant
impairment of the child’s physical health and emotional development if [Amanda]
were appointed as the child’s sole managing conservator.  This includes her choices to use drugs, to
drink alcohol, to get involved with criminal male partners and to commit
criminal offenses.

(d)     That [Amanda] repeatedly engaged in conduct
creating a dangerous living environment for a child, leading to the child in
this case being raised almost exclusively by [Appellees] since on or before
June 10, 2007 and which lead to [Appellees’] substantial involvement in raising
the child, and their being the parental figures for the child, since shortly
after the child’s birth.  It would
substantially impair the child’s emotional development now to disrupt his
relationship with [Appellees] by appointing [Amanda] as his sole managing
conservator.

 

III.  Conservatorship

          In her first issue, Amanda argues that
the trial court abused its discretion by naming her and Appellees joint
managing conservators of K.R.B.  In her
second issue, Amanda argues that the evidence is legally and factually
insufficient to establish—and
that the trial court therefore abused its discretion by finding—that appointing her as the sole
managing conservator of K.R.B. or as a joint managing conservator of K.R.B.
with the right to designate K.R.B.’s primary residence would not be in his best
interest because it would significantly impair his physical health or emotional
development.

          A.      Standard of Review

          We review a trial court’s decision
regarding the conservatorship of a child under an abuse of discretion
standard.  In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007); In re M.P.B., 257 S.W.3d 804, 811
(Tex. App.—Dallas 2008, no
pet.).  To determine whether a trial
court abused its discretion, we must decide whether the trial court acted
without reference to any guiding rules or principles; in other words, we must
decide whether the act was arbitrary or unreasonable.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 (Tex. 1985), cert. denied,
476 U.S. 1159 (1986).  An abuse of
discretion does not occur as long as some evidence of a substantive and
probative character exists to support the trial court’s decision.  Whitworth
v. Whitworth, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no
pet.).

          In
an abuse of discretion review, legal and factual insufficiency are not
independent grounds for asserting error but are merely relevant factors in
assessing whether the trial court abused its discretion.  In re
M.P.B., 257 S.W.3d at 811.  Thus, in
applying the abuse of discretion standard, an appellate court in a family law
case must apply a two-prong analysis:  (1) whether the trial
court had sufficient evidence upon which to exercise its discretion; and (2) whether
the trial court erred in applying its discretion.  In re
M.C.F., 121 S.W.3d 891, 895 (Tex. App.—Fort Worth 2003, no pet.).

          We may sustain a legal sufficiency challenge only when
(1) the record discloses a complete absence of evidence of a vital fact;
(2) the court is barred by rules of law or of evidence from giving weight
to the only evidence offered to prove a vital fact; (3) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (4) the
evidence establishes conclusively the opposite of a vital fact.  Uniroyal Goodrich Tire Co. v. Martinez,
977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999);
Robert W. Calvert, "No Evidence" and "Insufficient
Evidence" Points of Error, 38 Tex. L. Rev. 361, 362–63 (1960).  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.  Cent. Ready Mix Concrete Co. v.
Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).

          When reviewing an assertion that the evidence is
factually insufficient to support a finding, we set aside the finding only if,
after considering and weighing all of the evidence in the record pertinent to
that finding, we determine that the evidence supporting the finding is so weak,
or so contrary to the overwhelming weight of all the evidence, that the answer
should be set aside and a new trial ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629,
635 (Tex. 1986) (op. on reh’g); Garza v. Alviar, 395 S.W.2d 821, 823
(Tex. 1965); In re King’s Estate, 150 Tex. 662, 244 S.W.2d 660, 661
(1951).

          B.      Parental
Presumption

          The
presumption that the best interest of the child is served by awarding custody
to the parent is deeply embedded in Texas law. 
In re V.L.K., 24 S.W.3d
338, 341 (Tex. 2000) (citing Lewelling v.
Lewelling, 796 S.W.2d 164, 166 (Tex. 1990)).  The legislature codified the presumption in
chapter 153 of the family code.  Id. 
Section 153.131(a) provides as follows:

Subject to the prohibition in Section 153.004,[[4]] unless the court finds
that appointment of the parent or parents would not be in the best interest of
the child because the appointment would significantly impair the child’s
physical health or emotional development, a parent shall be appointed sole
managing conservator or both parents shall be appointed as joint managing
conservators of the child.

Tex. Fam. Code
Ann. § 153.131(a) (Vernon
2008).  Thus, the nonparent can rebut the
parental presumption by showing that the appointment of the parent would
“significantly impair the child’s physical health or emotional development.”  Id.;
see V.L.K., 24 S.W.3d at 341.

          Section 153.131(a) creates a “strong
presumption” in favor of parental custody and imposes a “heavy burden” on a
nonparent.  Lewelling, 796 S.W.2d at 167. 
Impairment must be proved by a preponderance of the evidence indicating
that some specific, identifiable behavior or conduct of the parent,
demonstrated by specific acts or omissions of the parent, will probably cause
that harm.  Id.; Critz v. Critz, 297
S.W.3d 464, 474 (Tex. App.—Fort
Worth 2009, no pet.).  This link between
the parent’s conduct and harm to the child may not be based on evidence that
raises mere surmise or speculation of possible harm.  In re
De La Pena, 999 S.W.2d 521, 528 (Tex. App.—El Paso 1999, no pet.); In re
M.W., 959 S.W.2d 661, 665 (Tex. App.—Tyler
1997, writ denied).  The nonparent’s
heavy burden is not satisfied by merely showing that the nonparent would be a
better custodian of the child, and “close calls” should be decided in favor of
the parent.  Lewelling, 796 S.W.2d at 166–68.

          Acts or omissions that constitute significant
impairment include, but are not limited to, physical abuse, severe neglect,
abandonment, drug or alcohol abuse, or immoral behavior on the part of the
parent.  De La Pena, 999 S.W.2d at 528. 
When determining fitness of a parent, the material time to consider is
the present.  M.W., 959 S.W.2d at 666.  “If
the parent is presently a suitable person to have custody, the fact that there
was a time in the past when the parent would not have been a proper person to
have such custody is not controlling.”  May v. May, 829 S.W.2d 373, 377 (Tex.
App.—Corpus Christi 1992, writ
denied).  Evidence of past misconduct may
not by itself be sufficient to show present unfitness.  Id.

          C.      Appointment
of Appellees and Amanda

          In
her first issue, Amanda contends that the trial court abused its discretion by
appointing both Appellees and her as joint managing conservators of K.R.B.
because it “failed to give the proper weight to the parental presumption” in
section 153.131.  She argues that the
trial court did not have the option under section 153.131 to appoint both her
and Appellees joint managing conservators of K.R.B and that the trial court did
not apply the parental presumption articulated in section 153.131 but instead
applied only a best interest standard.

          Section 153.372 authorizes a trial
court to appoint both parents and nonparents as joint managing
conservators.  Tex. Fam. Code Ann. § 153.372(a) (Vernon 2008).  Regarding the parental presumption in such a
case, in Critz this court reasoned
that “[t]here is no language in section 153.131 that indicates that the
[parental] presumption is inapplicable to the appointment of non-parents as
joint managing conservators when the trial court also appoints one or both parents.” 
Critz, 297 S.W.3d at 471
(emphasis added).  In other words,
section 153.131(a) demands that the parental presumption apply when a nonparent
seeks managing conservatorship in lieu of or in addition to the parent.  Id.

          Here, the trial court’s findings of
fact track the language of section 153.131(a) and demonstrate that it applied
the parental presumption to the determination of managing conservatorship,
notwithstanding that it appointed both Amanda and Appellees as joint managing
conservators of K.R.B. but found that it is not in K.R.B.’s best interest for
Amanda to be appointed sole managing conservator or joint managing conservator
along with Joshua.  Amanda’s
interpretation of section 153.131(a) conflicts with the plain language of
section 153.372(a).  We overrule Amanda’s
first issue.

          D.      Overcoming the Parental Presumption

          In her second issue, Amanda challenges
the legal and factual sufficiency of the evidence to establish that appointing
her as sole managing conservator or as a managing conservator with the right to
designate K.R.B.’s primary residence would not be in K.R.B.’s best interest
because it would significantly impair his physical health or emotional
development.[5]  We will examine the sufficiency of the
evidence to support the trial court’s seventh finding of fact that appointing
Amanda as sole managing conservator is not in K.R.B.’s best interest.

                   1.       Evidence

                             a.       Amanda

          Amanda testified that she is
twenty-three years old, that she moved in with her mother in September 2007,
and that she has been kicked out of Section 8 housing twice.  She has another child, K.G., who is three
months old.  Kenneth G. is K.G.’s
father.  Amanda started dating Kenneth in
October 2008.  Amanda explained that
Joshua is in prison, that she started dating Dustin in June 2007, and that she
continued to date Dustin even though she knew he had a criminal history.  Amanda did not have a boyfriend at the time
of trial.

          Amanda started using drugs in 2005 or
2006 and continued using drugs for some time after K.R.B. was born.  CPS removed K.R.B. from Amanda’s care in May
2007 because she failed a hair follicle test. 
Thereafter, Amanda missed a number of visits with K.R.B. and did not
comply with the child safety and evaluation plan that she had agreed to with
Appellees because she was still using drugs.

          There was extensive testimony
detailing Amanda’s criminal history.  On
or about January 11, 2008, Amanda pleaded guilty to the offense of possession
of between four and two hundred grams of a controlled substance, namely
methamphetamine, and the trial court placed her on ten years’ deferred
adjudication probation.  Officer Charles
Roberts testified about the circumstances surrounding Amanda’s arrest, which
occurred on December 26, 2006.  According
to Officer Roberts, he responded to a call that he described as a “check
welfare of a child that was inside of an apartment that was possibly cooking
methamphetamine.”  As he approached the
apartment, Officer Roberts met Joshua, who was coming out of the apartment.  Joshua gave Officer Roberts permission to
enter the apartment, but he yelled, “The police are here,” when Officer Roberts
entered the apartment.  Officer Roberts
observed Amanda, who was in a back bedroom, place something on the floor.  In the bedroom, he discovered three baggies
containing a substance that he believed to be methamphetamine—one on the floor where Amanda had
placed something and two on the bed where Amanda had been seated.  Officer Roberts also observed a purse on the
bed and a methamphetamine pipe protruding from it.  Amanda claimed to have owned the purse and
the methamphetamine on the floor. 
Officer Roberts did not testify that he discovered an infant in the
apartment.

          On or about January 11, 2008, Amanda
pleaded guilty to the offense of possession or transportation of certain chemicals
(anhydrous ammonia) with intent to manufacture a controlled substance, namely
methamphetamine.  The trial court placed
Amanda on ten years’ deferred adjudication probation.  The date of the offense was July 22,
2007.  Also on or about January 11, 2008,
Amanda pleaded guilty to the offense of possession or transportation of certain
chemicals (pseudoephedrine) with intent to manufacture a controlled substance,
namely methamphetamine.  The date of the
offense was also July 22, 2007, and the trial court placed Amanda on ten years’
deferred adjudication probation.  Officer
Jeff Li testified that as he was responding to a call about a suspicious
vehicle parked near a residence, he observed the suspicious vehicle drive past
him in the other direction.  He initiated
a traffic stop when he saw that the vehicle did not have any working
taillights.  The vehicle drove for about
a block before pulling over.  The driver
of the vehicle, Dustin, exited the vehicle and fled on foot; Amanda was in the
passenger seat.  Officers discovered
anhydrous ammonia, pseudoephedrine pills, and lithium strips—chemical precursors for
manufacturing methamphetamine—in
the vehicle.  Amanda denied owning the
vehicle, but a bill of sale found in the glove box was made out to her.  Officers also discovered a switchblade in her
purse and handcuffs, some ammunition, and a large dagger in the vehicle.

          On or about January 24, 2008, Amanda
pleaded guilty to the offense of prohibited substance in a correctional
facility, and the trial court placed her on ten years’ deferred adjudication
probation.  Deputy Donnie Cavinder
testified that on December 10, 2007, he observed Amanda place a tobacco product
in a dumpster near the jail.  Amanda
admitted that she had left the paraphernalia for Dustin and that she had done
so on three or four other occasions. 
Amanda’s mother drove Amanda to the dumpster to make the drop, but she
was not charged with any offense.

          In addition to the four felonies,
Amanda testified that she had accumulated five misdemeanors, “quite a bit” for
someone her age.

          The trial court admitted MySpace and
Facebook pages belonging to Amanda, Kenneth, Connie (Amanda’s former best
friend), and Dustin.  The exhibits
contain a number of undated images of Amanda and others drinking and partying.  Amanda testified that some of the images were
from October 2008.  An entry on Amanda’s
MySpace page states, “Amanda fucking rage last night omg we had a total blast
doing it again today hell ya.”  Amanda
admitted that one of her conditions of probation prohibited her from consuming
alcohol.

          Amanda stated that some of the
individuals who were at the apartment where she was arrested on December 26,
2006, were drug users who had been involved in the criminal justice
system.  She admitted that K.R.B. had been
around some of these people on a number of occasions.  Amanda agreed that the lifestyle she was
leading up until being placed on probation was not a lifestyle that a child
should be subjected to and that it was dangerous for a child to be around
people who used and manufactured drugs. 
She agreed that it was not in K.R.B.’s best interest when she used drugs
after he was born.

          Amanda did not deny that she had
committed any of the criminal conduct detailed above, but she stated that she
has changed her life.  According to
Amanda, she had not used illegal drugs since January 2008, when she was placed
on probation.  She submitted to hair
follicle tests on August 28, 2008; December 11, 2008; February 25, 2009; and
September 29, 2009; and each test result was negative.  In March 2008, Amanda completed a
twenty-eight day rehabilitation program at Serenity House in Abilene.  She also completed parenting classes while at
the program.  Amanda stated that she
progressed uninterrupted through the visitation schedule set out by the
September 2008 temporary orders and that she had not missed a visit with K.R.B.
since the orders were entered.  Amanda
testified that she had paid child support to Appellees for about a year[6]
and that she had also complied with the temporary orders by not seeing Dustin.[7]

          Amanda testified that she works at
Michael’s as a “front end supervisor.”  She
has worked there since April 2008, and she works twenty-five hours per week but
is hoping to begin working full time at some point.  The department manager described Amanda as a
“very hard worker,” “very dependable,” and “always on time.”  The manager testified that Amanda is around
money all the time, that she trusts Amanda “more than anybody else,” and that
there had not been any openings for a full-time position since Amanda began
working there.

          Amanda testified that she agreed to
let K.R.B. live with Appellees after CPS intervened because she knew that they
could provide him with the care that he needed. 
But she explained that she had always wanted K.R.B. to be returned to
her once she achieved her goals and that she felt like she deserved to have him
back.[8]

          Amanda stated that she could live with
her mother as long as she needed and that her mother’s house would provide a
safe environment for K.R.B.  She
described her relationship with K.R.B. as “great.”  Amanda testified that K.R.B. would “cling” to
Laura when she dropped him off for visits but said that happened when he was
not feeling well.  Recently, when Laura
drops off K.R.B., he “goes right to his room and we play.”  Amanda stated that she and K.R.B. play
together and sing together and that K.R.B. opened up to her and calls her “mommy.”
 At the time of trial, Amanda and
Appellees were concluding weekend visits and were moving on to a standard
visitation schedule.

                             b.       Probation
Officer

          Traci Poore, Amanda’s probation
officer, testified that over the course of roughly the past twenty months
before trial, Amanda had passed both of the urinalyses that she had been asked
to take and that Amanda had reported to the probation office every month.  Poore stated that she had visited Amanda’s mother’s
and father’s houses and that there had not been anything at either house that
caused her concern.  Poore also testified
that in her visits with Amanda, she had never had any concern that Amanda was
under the influence of drugs.  Regarding
the image on the MySpace or Facebook page of Amanda consuming alcohol, Poore
testified that infraction alone would not cause Amanda’s probation to be
revoked.

                             c.       Amanda’s
Mother

          Terri G., Amanda’s mother, testified
that she had seen no signs that Amanda was using drugs again and that she had
seen a “big change” in Amanda.  She
stated,

Q       Now,
describe Amanda back when CPS first got involved.  What kind of person was Amanda?

A       We didn’t
have much of a relationship.  She was my
daughter, but she was on drugs.  She’s
made a lot of mistakes.  She’s paid for a
lot of those mistakes, and she knows the mistakes that she’s made.

          And she
wants to live her life different now. 
She’s - - I mean, back then we couldn’t really talk.  We didn’t have much of a relationship.  But right now, she’s my best friend.

                   . . . .

Q       Have you
seen a big change in her life?

A       Oh,
yeah.  Yeah.

Q       What kind
of changes have you seen in her life?

A       She’s
more focused on tomorrow.  She’s talked
about going to school.  She’s thought - -
you know, she’s wanting to go on to school to get an education.  To further her education.

          She’s a more caring person.  A whole lot more caring.  She thinks about other people a lot of times
more than she does herself.

 

Terri testified
that Amanda could live with her “forever,” that she did not allow people in and
out of her house, and that she would not allow Amanda to bring someone to the
house that could cause K.R.B. harm.  She
stated that K.R.B. was not in danger when he was at her house, that no one
smokes in K.R.B.’s presence, that K.R.B. was watched closely while at the
house, that it did not take time for K.R.B to adjust to being at the house when
he would come over, and that overnight visits would be good for K.R.B.[9]

                             d.       Amanda’s
Father

          Like Terri, Barry G., Amanda’s father,
testified that he had seen a change in Amanda over the eighteen months before
trial and that there had not been a point during that time that he thought
Amanda was under the influence of drugs. 
Barry stated that Amanda was “herself again,” that “she’s got her life
on track,” and that he believed Amanda could be a good mother.  Although he was not present when K.R.B. was
dropped off or when K.R.B. left, Barry testified that he was often around when
K.R.B. visited with Amanda, that Amanda took very good care of K.R.B., that he
did not feel that K.R.B. was physically or emotionally harmed when he was with
Amanda, and that Amanda would not do anything to harm K.R.B.  Barry opined that K.R.B., whom he had formed
a relationship with, would not have a problem with overnight visits and that he
would adjust to them well.

                             e.       Amanda’s
Sister

          Brittany G., Amanda’s sister, also
testified that she had seen a “big change” in Amanda.  She stated that she did not have a
relationship with Amanda when K.R.B. went to live with Appellees because of
Amanda’s drug problem.  Now, however,
Amanda was the “big sister that [she] never had.”  Brittany could not recall any occasions
lately in which she was around Amanda and felt like Amanda was using
drugs.  She testified that she did not
think that Amanda would do anything to harm K.R.B. and that K.R.B. could begin
overnight visitations with Amanda.

                             f.       Laura

          Laura testified that she and Hubert
offered to help Amanda and Joshua with caring for K.R.B. when he was born.  Soon thereafter, Appellees watched K.R.B.
every weekend and, eventually, more often than just during the weekend.  When K.R.B. was six months old, Appellees
watched K.R.B. for two weeks after Amanda and Joshua had dropped him off with
Laura’s sister and proclaimed that they “need[ed] some time”; Laura suspected
that Amanda and Joshua’s lifestyle was getting out of control.  Laura opined that when CPS intervened in May
2007 (K.R.B. was eight months old), she and Hubert had cared for K.R.B. for
approximately 120 days.

          Appellees originally agreed with
Amanda that they would care for K.R.B. while Amanda “[got] her act together,”
but they filed this suit after Amanda was arrested for smuggling tobacco into
the jail.  Laura stated that she and
Hubert had serious concerns for K.R.B.’s well-being after that incident, which
they agreed was the “last straw.”

          Laura testified that she had concerns
about K.R.B. being under Amanda’s care. 
One concern regarded Amanda’s former drug use and the people that Amanda
used to associate with, including the three men Amanda used to date—Joshua, Dustin, and Kenneth.  In light of the exhibits containing the
MySpace and Facebook images, Laura stated that her greatest concern was if
Amanda was continuing to associate with the same people she was around when she
used illegal drugs.  Laura clarified in
the following exchange with the trial court that she did not think that K.R.B.
was in any danger of physical harm or abuse from Amanda or her family; rather,
she was worried about the people that Amanda chose to associate with:

THE COURT: 
[Laura], I’ve got just maybe one or two questions.  With regards to Mr. and Mrs. G[], the
grandparents - -

                   . . . .

THE COURT:  - -
do you - - is it your opinion that the child is safe when he’s in - - when he’s
visiting with them, with them present? 
Is he placed in harm’s way in any way?

[Laura]:  I
would hope not.  I’d like to think not.

THE COURT: 
Well, I’m - - I’m asking your opinion.

[Laura]:  In my
opinion, the environments just are not conducive.

THE COURT: 
Okay.

[Laura]:  They
came into the picture when he was 10 months old.

THE COURT: 
Well, I understand that.  I’m
asking:  Is he in danger of any kind of
physical harm or abuse - - 

[Laura]:  From
them?  No.  From the people that Amanda keeps, that’s who
we worry about.  From her family, no.

          Laura also expressed concern about
disrupting K.R.B.’s stability.  She
testified that she and Hubert had raised K.R.B. for over two years, that K.R.B.
had bonded with them, that K.R.B. was not ready for change, that K.R.B. was not
ready for overnight visits, and that there was no need to “emotionally scar[]”
him.  Laura claimed that K.R.B. viewed
Appellees as his parents and that his “stable atmosphere” was with them.  In support of her claim that K.R.B. did not
adjust well to change, she testified that he had difficulty transitioning from
one daycare class to another.

          Laura further testified that she was
concerned about dogs inside Amanda’s house and smoke in the house before K.R.B.
came over for visits.  She also recounted
that Amanda was unable on one occasion to administer K.R.B.’s allergy medicine.

                             g.       Hubert

          Hubert’s testimony mirrored Laura’s
testimony.  He testified that considering
Amanda’s history, he had concerns about K.R.B.’s physical safety and emotional
stability due to the people who K.R.B. might be around when he is with Amanda;
that he did not think K.R.B. would be ready for overnight stays with Amanda
until he is older; that K.R.B. had bonded with Laura; and that he was concerned
about K.R.B.’s exposure to smoke at Amanda’s house and Amanda’s ability to
administer K.R.B.’s allergy medicine.

                             h.       Appellees’
Friend

          Karen Albus, Appellees’ friend,
testified that K.R.B. had some difficulty interacting with strangers and that
she had concerns about K.R.B.’s welfare in light of Amanda’s past.

                   2.       Insufficient Evidence to
Overcome Parental Presumption

          In Lewelling,
the supreme court reversed the lower court’s decision to appoint the paternal
grandparents of the child managing conservators on the ground that naming the
mother managing conservator would significantly impair the child’s physical
health and emotional development.  796
S.W.2d at 165.  Reasoning that a
nonparent must “offer evidence of specific actions or omissions of the parent
that demonstrate an award of custody to the parent would result in physical or
emotional harm to the child,” the court concluded that the following evidence
was no evidence that appointing the mother as managing conservator would
significantly impair the child’s physical health or emotional development:  (1) mother was unemployed at the time of
the custody hearing; (2) mother lived in crowded conditions; (3) mother
had twice been a patient at Terrell State Hospital; (4) mother’s
ex-husband had physically abused her, including when she was pregnant; (5) mother
testified that she might consider reconciling with her ex-husband; (6) the
child had resided most of his life with the grandparents; and (7) mother
did not see the child for a two-month period at one point.  Id.
at 165–67, 172 (Gonzalez, J.,
dissenting).

          In In re
S.W.H., this court reversed the trial court’s judgment appointing
nonparents sole managing conservators of the child on the basis of section
153.131 impairment grounds.  72 S.W.3d
772, 777–79 (Tex. App.—Fort Worth 2002, no pet.).  Evidence that the mother (1) used to
have a severe drug addiction, (2) was a recovering alcoholic and drug
addict, (3) was incarcerated in a substance abuse treatment facility for
twice testing positive for drug use in violation of her probation, and (4) had
a live-in boyfriend at the time of trial who consumed alcohol outside the house
was insufficient to support the trial court’s challenged findings.  Id.
at 778–79.  Regarding the evidence of the mother’s drug
use, we stated that “none of this evidence regarding Appellant’s actions more
than four years ago demonstrates that appointing Appellant managing conservator
today would significantly impair
S.W.H.’s physical health or emotional development.”[10]  Id.
at 778 (emphasis added).

          In this case, Appellees’ concerns
about K.R.B.’s physical health and emotional development fall into four
categories:  (1) Amanda’s past criminal conduct and drug use[11];
(2) the crowd that Amanda used to associate with[12];
(3) K.R.B.’s emotional attachment to Appellees and his difficulty
adjusting to change[13];
and (4) issues regarding smoke at Amanda’s house and her ability to
administer K.R.B.’s allergy medicine. 
Although relevant, the evidence of Amanda’s past criminal conduct and
drug use does not demonstrate that appointing Amanda sole managing conservator
at the time of trial would have significantly impaired K.R.B.’s physical health
or emotional development.  See id. 
(reasoning that evidence of mother’s past severe drug addiction was
not evidence that appointing her managing conservator would significantly
impair child); May, 829 S.W.2d at 377
(reasoning that if the parent is presently a suitable person to have custody,
that there was a time in the past when the parent would not have been a proper
person to have such custody is not controlling).  The evidence shows that since being placed on
probation roughly twenty months before trial, Amanda had passed multiple drug
tests, had complied with her probation requirements, and had given no person
who testified any indication that she had been under the influence of
drugs.  Amanda’s testimony that she had
not used drugs since being placed on probation was uncontroverted.

          Appellees expressed strong concern for
K.R.B. regarding the crowd that Amanda used to associate with.  But there is no evidence that Amanda
continued to associate with or was currently associating with Joshua or Dustin
or anyone else who uses or used to use illegal drugs.  Appellees’ concerns that Amanda would resume
associating with those persons once again at some point in the future are based
on mere speculation and surmise, which is insufficient to support the trial
court’s finding.  See De La Pena, 999
S.W.2d at 528 (reasoning that harm to the child may not be based on evidence
that raises mere surmise or speculation of possible harm).

          Appellees had concerns that K.R.B.
would be emotionally harmed because he had lived much of his life with them, he
had bonded with Laura, and he had difficulty adjusting to strangers.  In Lewelling,
the supreme court considered evidence that the child had resided most of his
life with the nonparents but concluded that the evidence was insufficient to
demonstrate harm.  See Lewelling, 796 S.W.2d
at 167–69, 172 (Gonzalez, J.,
dissenting).  We conclude similarly.  Appellees also did not identify a specific,
identifiable behavior or conduct of Amanda that caused or would probably cause
harm to K.R.B.’s emotional development, nor did they present expert testimony
that K.R.B.’s emotional development would be significantly impaired if Amanda
is sole managing conservator.  See S.W.H., 72 S.W.3d at 778–79. 
That Appellees may be better parents than Amanda is insufficient to
rebut the parental presumption.  See Lewelling,
796 S.W.2d at 166.

          Appellees’ concerns about Amanda’s
administering medicine to K.R.B. and smoke in the house is some evidence of
harm.

          In S.W.H.,
this court addressed the heavy burden that nonparents face in overcoming the
parental presumption:

It is an onerous burden to overcome the presumption
that a child’s natural parent should be appointed sole managing conservator
absent some specific act or omission that demonstrates present parental
unfitness.  Although trial courts should
be afforded broad discretion in deciding family law questions, the legislature
has explicitly limited the exercise of that discretion when a nonparent seeks
appointment as managing conservator.

S.W.H., 72 S.W.3d at 779 (citations
omitted).  This case represents the type
of “close call” that the supreme court addressed in Lewelling.

          Accordingly, viewing the entire record
under the legal and factual sufficiency standards of review articulated above,
we conclude that, while there is some evidence that placing K.R.B. under the
sole managing conservatorship of Amanda might significantly impair K.R.B.’s
physical health and emotional development, the evidence is factually
insufficient to support a finding of such impairment.  We therefore hold that the trial court abused
its discretion by so finding.  We sustain
this part of Amanda’s second issue.

          Having sustained Amanda’s evidentiary
sufficiency challenge to the trial court’s seventh finding of fact, we do not
address her challenge to the part of the trial court’s fifth finding of fact
that appointing her as a managing conservator with the exclusive right to
designate K.R.B.’s primary residence would significantly impair K.R.B.’s
physical health or emotional development. 
See Tex. R. App. P. 47.1; see also Critz, 297 S.W.3d at 472 (reasoning that section 153.131 “contains
no language that indicates a legislative intent that a parental presumption
applies to the issue of primary custody apart
from the determination of joint managing conservatorship”; section 153.131
“makes no reference to a separate presumption for determining which joint managing
conservator chooses the child’s permanent residence”).

IV.  Conclusion

          Having sustained part of Amanda’s
second issue, we reverse the trial court’s order and remand the case to the
trial court for a new trial.

 

 

 

 

 

                                                                             
 
 
 
 
 
 
 
 
 BILL MEIER

                                                                            
 
 
 JUSTICE

 

PANEL:  
 
 
 
 
 
 
 WALKER, 
 
 
 
 
 
 MCCOY, and 
 
 
 
 
 
 MEIER, JJ.

 

DELIVERED:  October 7, 2010











[1]See Tex. R. App. P. 47.4.





[2]CPS
had closed its case on K.R.B. in late July 2007, but K.R.B. remained with
Appellees.





[3]The
temporary orders stated that Joshua waived issuance and service of citation by
waiver and did not appear.  At final
trial, Amanda testified that there is a possibility that Joshua, who was in
prison at the time, is not K.R.B.’s father, but she acknowledged that the trial
did not concern the question of Joshua’s parentage.





[4]Section
153.004 states in relevant part that in determining conservatorship, a court
shall consider evidence of the intentional use of abusive physical force and
that a court may not “appoint joint managing conservators if credible evidence
is presented of a history or pattern of past or present child neglect, or
physical or sexual abuse by one parent directed against the other parent, a
spouse, or a child . . . that results in the other parent becoming
pregnant with the child.”  Tex. Fam. Code
Ann. § 153.004(a), (b)
(Vernon 2008).





[5]Amanda
does not challenge the part of the trial court’s fifth finding of fact that
appointing both her and Joshua as the only joint managing conservators would significantly
impair K.R.B.’s physical health or emotional development.





[6]Amanda
admitted owing Appellees $595 in child support.





[7]Amanda
did post a comment on Dustin’s MySpace page.





[8]Amanda
agreed that Appellees should have some visitation with K.R.B.





[9]Terri
testified that she did not know what was happening when she drove Amanda to the
jail and Amanda left tobacco for Dustin.





[10]Other
evidence in the sufficiency analysis included that the mother had managed to
stay “clean” during the one and one-half years that she lived with the
boyfriend up to the time of trial, that the child would be well cared for in
the mother’s current living situation, that a CPS caseworker did not have
health or safety concerns for the child when the caseworker first intervened on
behalf of the child, and that it was apparent that CPS intended the nonparents
to return the child to the mother once she had completed treatment and
corrected her problems.  S.W.H., 72 S.W.3d at 778–79.





[11]This
includes the trial court’s findings of fact 7(a), (b), (c), and (d).





[12]This
includes the trial court’s findings of fact 7(a), (b), and (d).





[13]This
includes the trial court’s findings of fact 7(d).